*Richmond.*

LEE v. HARLOW, TREASURER, &c.

November 14.

L holding coupon bonds issued under the act of March, 1871, after the passage of the acts of March 7th and March 19th, 1872, received from the auditor of the State two-thirds of the interest due thereon, which payment was stamped upon the coupons. In 1880 he offered to the collector of the State taxes the said coupons for the one-third unpaid thereon, in payment of taxes due from him to the State. HELD: L is entitled to pay his taxes due the State, in the unpaid one-third of said coupons.

This was an application to this court by Cassius F. Lee, Jr., for a writ of mandamus to compel M. B. Harlow, treasurer of the city of Alexandria, and as such collector therein of the State taxes, to receive in payment for taxes of 1879 due by the petitioner, the over due coupons of bonds issued by the State under the act of March 30th, 1871, which provided that coupons to bonds issued under that act should be receivable for all taxes, debts, &c., due the State.

Harlow, the treasurer, answered, and relied upon the act of March 7th, 1872, which provided that hereafter it should not be lawful for the collectors of taxes or other demands of the State, due now, or that hereafter shall become due, to receive in payment therefor anything else than gold or silver, United States treasury notes, or notes of the national banks of the United States. That by the 4th section of the act of March 19th, 1872, under which interest to the amount of two-thirds of the coupons tendered by the petitioner was paid, it was expressly provided that the receipt of interest under the provisions of this act shall be held

and deemed to be an acquiescence upon the part of the creditor, in the provisions of an act declaring what shall be receivable in payment of public dues. And he insists that the reception by the petitioner of interest under the act of the 19th of March, 1872, was a waiver of the receivability of said coupons, as to the balance remaining unpaid upon them, and an acceptance on the part of the holders of said coupons as to said balance of the provisions of the act of March 19th, 1872.

It appears that the petitioner, C. F. Lee, Jr., had applied at the office of the State and had received two-thirds of the amount of the coupons he presented for payment, which payment was endorsed on the coupons; and it was the other third of said coupons that he tendered to the treasurer, Harlow, in payment of his taxes.

*S. F. Beach,* for the petitioner.

*The Attorney-General,* for the treasurer.

ANDERSON, J. The petitioner held coupons of the Commonwealth which upon their face bound the Commonwealth to receive them at and after their maturity in payment of all taxes, dues, demands, &c., due the State. They were presented to the auditor for payment, who paid two-thirds of the amount, and stamped upon the coupons two-thirds paid, and then returned them to the owner. Those coupons, for the balance due on them respectively, have since been tendered to the treasurer of Alexandria by the holder in payment of taxes of the Commonwealth which he had for collection against him; but the said treasurer refused to receive them in payment thereof; and the holder of said coupons petitioned this court for a *mandamus* to compel the said treasurer to receive them in payment of his said taxes to the Commonwealth; and the case comes up

upon a rule *nisi* for a *mandamus*, which was awarded by this court.

The treasurer demurred to the petition upon the ground that it is not sufficient in law to entitle the petitioner to the writ of *mandamus.*

He also, without waiving his demurrer, but insisting on the same, answers, and resists the awarding of the writ, upon the ground that under the act of 19th of March, 1872, he received two-thirds of his said coupons, and by reason thereof is not entitled to receive the residue in payment of taxes.

No grounds are set out in support of the demurrer, and I am at a loss to apprehend what ground it can rest on. It was not insisted on by the learned counsel for the State in argument, and I deem it unnecessary to notice it further than to say, it must be overruled.

Upon the answer the question is raised, was it competent for the legislature, in appropriating money to pay two-thirds of an acknowledged debt of the State, to couple it with a condition that if the creditor receives it, he shall be deemed to have acquiesced, without consideration, in a previous act of the legislature, otherwise not binding on him, which denies to him the benefit of his contract as to the remaining third of his debt or his security for it?

The obligation of the State was for the whole debt, evidenced by the coupons. It is not true that there was not an obligation on the legislature to provide for the payment of the whole, and to make an appropriation therefor. The constitution, which gave them all the authority they had to legislate at all, laid upon them the obligation to provide the means for the payment, and to make appropriations for that purpose. And the appropriation for the payment of two-thirds was doing only in part what the legislature was morally and constitutionally bound to do. And the doing of that could constitute no consideration for a surrender by

Lee v. Harlow, Treasurer, &c.

the creditor of the balance of his debt, or the securities to which he was entitled by contract for its payment. The creditor got no benefit. He got only a part when he was entitled to the whole; and the State lost nothing by the payment of a part of what she honestly owed. Consequently if such a contract had been made, it was without consideration. It was *nudum pactum*, and could not be enforced.

In *Warren* v. *Skinner*, 20 Conn. R. 561, Ellsworth, J., said, "It is no longer a question whether payment of part of a debt is a satisfaction of the whole, either considered as a payment, or accord and satisfaction. * * * An accord (he said) is an agreement. But there is no agreement without a consideration; and receiving part is no consideration for an agreement not to collect the rest. It is a *nude pact.*"

In *Fitch* v. *Sutton*, 5 East. R. 231, Lord Ellenborough, C. J., said, "It is impossible to contend that acceptance of £17 10s. is an extinguishment of a debt of £50. There must be some consideration for the relinquishment of the residue—something collateral to show a possibility of benefit to the party relinquishing his further claim, otherwise the agreement is *nudum pactum*. But the mere promise to pay the rest when of ability put the plaintiff in no better condition than he was before. If the obligee receiveth part and maketh acquittance under his seal in full satisfaction of the whole, it is sufficient by reason that the deed (which imports a consideration) amounteth to acquittance of the whole."

In *Achen* v. *Phœnix*, 4 Paige R. 305, 308, the court said, "It is well settled that the payment by the debtor of a less sum of money than the real debt, forms no valid consideration for an agreement to discharge the residue. Such an agreement will be no satisfaction of the larger sum, unless it is under seal, which imports a consideration." This doctrine prevails in courts of equity, as well as in courts of

law, as was held in that case. Equity will not aid a party to enforce a voluntary agreement, which is neither founded on a valuable or a good consideration.

But the act of assembly in question proposes to take from the creditor the residue of his debt, or his security for it, which he is entitled to by the contract of the State, which is the same thing, by *implying* a contract on part of the creditor to surrender the residue of his debt from the fact that he received a part of it; which, we have seen, would not be a valid contract if it were expressed, because it would be without consideration. We have also seen that it is the established doctrine of courts of equity as well as law that the payment of a part of a debt is not an acquittance of the whole, unless the residue is released under seal; which imports a consideration. But this act does not require that the acquittance of the residue of the debt shall be under seal, but proposes to deprive the creditor of his security, which he is entitled to by contract—a constitutional right—by an arbitrary implication that he has surrendered it, and released the State from her obligation, merely from the fact that he received a part of the debt, which was tendered him, when he was not only entitled to receive a part, but the whole. If the State can be released from its obligation, not by the act of the creditor releasing her upon a good or valuable consideration, but by an arbitrary implication by the State herself of a contract by the creditor to release her without consideration, the contracts and obligations of the State have not the strength of cobwebs.

But the learned attorney-general urges that the contract implied by the act of the legislature was not for the acquittance and discharge of the residue of the debt, but only of the creditor's security; and upon this he seems to lay the stress of his argument. Is there any better ground for the assumption that the State may hold her creditor bound to

surrender to her his security for a debt to which he has a constitutional right, by an implied contract of surrender, for which the State gave no consideration, than there is for the assumption that the creditor may be held to have surrendered his debt without considerations? In either case it would be a *nudum pactum*. But why stick in the bark? Why should a great State, in weighing her obligations, seek to be relieved from them by *finesse?* Is not the surrender in this case of the security really a surrender of the residue of the debt? Can the creditor even realize anything from it, unless he is allowed to set it off against the taxes and demands of the Commonwealth against him?

But another view is presented, upon which it is contended the surrender by the creditor may be maintained. It is said that the validity of the creditor's claim that his coupons were receivable in payment of taxes, was disputed by the legislature; and the act of 7th of March, 1872, was passed, which forbid their being received in payment of taxes, whilst the holder insisted on his right to have them received in payment of his taxes, &c. And in order to adjust these difficulties and the questions as to the rights and liabilities of the parties respectively, an agreement of compromise was made between them that the State would pay two-thirds of the amount of the coupons, and the holder would surrender his right to receive the remaining third in payment of his taxes, &c.

There is no proof that there was any such agreement or compromise by the parties. The act of 19th of March does not show it upon its face. In fact, there is no proposition contained in the act for such an agreement or compromise. The proposition is not that the holder of the coupon shall surrender the right to set off the remaining one-third of his coupon against his taxes, but that he shall be deemed and held to acquiesce in the provisions of the act of 7th March. Nor is such an agreement proved by the

auditor, or by any other testimony. It only appears that the coupon was presented to the auditor for payment; that he paid two-thirds of it and stamped it on the coupon as a payment on it, and returned it, with the credit endorsed on it, to the owner. Not a word said about his acquiescing in the act of 7th of March, 1880; or that by receiving two-thirds of what was due him he would be held to have surrendered his security for the balance. There is nothing to show that he was induced by the act of 19th of March to present it to the auditor for payment.

Whilst the act of 30th of March, 1871, provided that the coupons should be receivable in payment of taxes, &c., it did not take from the holder the right to receive payment directly from the treasury. And but for the depreciation of their marketable value, by the legislature failing to provide the means for their payment, they would generally have been paid from the treasury, and would rarely, if ever, have been purchased to be used in payment of taxes. It is not at all improbable, if the act of 19th of March had never been passed, that the coupons in question in this case would have been presented to the auditor for payment just as they were.

There is not a scintilla of proof that there was actually any such contract of compromise between the government and the holder of these coupons, as is conjectured in the argument of defendant's counsel; or that by receiving two-thirds of what the State owed him, he assented to the surrender of the balance, or his only security for it; or that he thereby in fact assented to, and acquiesced in, a previous act, which the legislature had no authority to pass, which deprived him of his securities, not only in the coupons which were then due, but which should become due. The pretension rests alone and exclusively upon the declaration in the act that if the holder of the coupon received a part of his interest under the provisions of said act of 19th of

March, he shall be deemed and held to have acquiesced in the provisions of the act of 7th of March. Now if the legislature had any warrant or authority to raise such an implication, it should plainly appear that the holder of the coupon had received interest under the provisions of said act, and that he did not receive it under his contract, in part of what was due him from the State; which he had a right to do. There is no provision in the act that if he received a part of his interest he shall be held to have received it under the provisions of that act. It was incumbent then on the Commonwealth to show that he received it under the provisions of that act. It is not sufficient that the auditor paid it under the provisions of that act, but it must be shown that the holder knowingly, intelligently, and intentionally received it under the provisions of that act, in order to raise an implication from his act, which would work in him a forfeiture of his lawful securities.

A party never can be held to have surrendered his rights under contract unless it appears that he made the surrender understandingly, and intentionally, and freely. Nor can such surrender or release be implied by his act, unless he understood at the time that such would be the effect of his act. It never can be implied by the act of a party accepting a part of what he had a right to demand, that he released his security for the balance without consideration. Nor can it be implied by his accepting of a part of what was due him, that he thereby assented to an unconstitutional act which deprived him of his remaining securities.

The legislature may pass an act cancelling and abrogating the obligations of the State to her creditors, in consideration of the State assuming other obligations to them, provided the creditor accepts it. But such act has no force or binding effect until notice of it is brought home to the creditor, and he accepts it. Without the assent of the

creditor the act is a nullity. And to give effect to it, it is necessary that the assent to it by the creditor be clear and unequivocal.

Such is the character of the act of 30th of March, 1871, called the funding act. It had no force or effect to any creditor of the State, unless he clearly and unequivocally accepted it by surrendering the State's obligations which he held, and accepting those which were offered in place of them. There was no provision in that act to release the State from its obligation by implying the assent of the creditor by an act which was so equivocal in its character as receiving a part of what the State owed him, whilst he was allowed to retain the State's obligation for the remainder.

The act of 19th of March, 1872, does not propose any compromise, but arbitrarily enacts that if the holder receives a part of his interest under the provisions of that act, he shall be deemed and held to have acquiesced in the act of 7th of March, an unconstitutional law, which forbids the receiving of any coupons "in payment of taxes or other demands of the State due now or that shall hereafter become due." A most extraordinary law. If the act of 7th of March was constitutional and valid, it needed not the assent of the holder of the coupons to give it validity, and was it competent for the legislature by the act of 19th of March to subject the citizen to a law which it believed to be, or apprehended was unconstitutional, by an arbitrary implication of his assent to it? The act of 7th of March being unconstitutional, is void *ab initio*, and no right could be conferred by it or taken away. It is a nullity. Is it not preposterous to hold that a creditor has lost his rights by an implication, that he acquiesced in that unconstitutional and void law?

The whole case for the defence rests upon section 4 of the act of 19th March, 1872, which is in these words: "The

receipt of interest under the provisions of this act shall be held and deemed to be an acquiescence upon the part of the creditor, in the provisions of an act declaring what shall be receivable in payment of public dues." (Acts of '71–72, p. 218, § 4.)  The act referred to in this section is the act passed March 7th, 1872, which is as follows:

1. Be it enacted by the general assembly of Virginia, That hereafter it shall not be lawful for the officers charged with the collection of taxes or other demands of the State due now or that shall hereafter become due, to receive in payment thereof any thing else than gold or silver coin, United States treasury notes, or notes of the national banks of the United States.

2. All acts or parts of acts inconsistent with this act are hereby repealed.

3. This act shall be in force from and after the passage. (Acts of '71–72, p. 141.)

I have attempted to show that it does not appear that the petitioner received a part of the interest which the State owed him under the provisions of this act.  But waiving that, and conceding that he received two-thirds of the amount due him upon his coupons under the provisions of that act, he cannot be lawfully held to have acquiesced in the provisions of the act last aforesaid of the 7th of March, not only because he received no consideration therefor, but because said act was unconstitutional and void, as this court has repeatedly declared it to be.

Such a declaration by the supreme court of last resort is a declaration that no such law ever existed, and in fact strikes it from the statute book; and with respect to all rights acquired, or obligations to be enforced, the case stands as if no such act had ever been passed.

How then can it be said that the acquiescence by a cred-

itor in an act which is judicially declared to be, by competent authority, and must be admitted to be no law, binds him for any purpose?

When we strip from the statutes the act of March 7th, 1872, there is nothing upon which the claim of the defendant can rest. And the claim of the State is therefore not only founded upon a *nudum pactum*, requiring the creditor to give up his whole debt, or his only security for it, without consideration, but he is held bound by an implied acquiescence in a law declared by the highest tribunal in the State, clothed with power to determine the question, to be unconstitutional and void, and as absolutely of no binding effect anywhere or against any person.

At the time the act of 19th of March was passed, the question as to the constitutionality of the act of 7th of March had not been adjudicated. But whether it had been before the holder received two-thirds of his coupons does not appear. If he had received payment before the said act was adjudged to be unconstitutional, the implication that he thereby acquiesced in an act which took from him his security for the residue of what was due him, would be to hold him bound by an unconstitutional and void act of the legislature. For the judgment of the court of last resort declaring said act to be unconstitutional and void, invalidates it from its first enactment.

If upon the presumption that the act was constitutional and binding, he had expressly agreed to abide by it, and it was afterward adjudged unconstitutional and void, it is not binding on him, and his agreement of acquiescence could not be enforced, especially as he had gained nothing and the State had lost nothing by the transaction.

But it is contended that he did gain something—that he received two-thirds of his debt, which he could not have compelled the general assembly to make an appropriation to pay. All that he received the State owed him; and it

was only a part of what the State owed him, and which was then due. I cannot well see how he gained anything when he got only a part of what was justly due him. The legislature was morally and constitutionally bound to make an appropriation to pay the whole, and failing to fulfill its constitutional and moral obligation in the whole, the fulfillment of it in part cannot be a consideration to support an agreement of the creditor to acquiesce in an unconstitutional law which would deprive him of the balance of his just demands on the State.

I have no doubt as to the constitutional right of the petitioner to set off the unpaid balance of his coupons which the State owes him against the taxes or other demands of the State against him notwithstanding the unconstitutional and void act of the 7th of March, 1872, forbids it—and I must so hold. I am of opinion therefore to make the rule absolute, and to award the *mandamus*.

STAPLES, J.   There is no controversy with regard to the facts of this case. It is conceded that the petitioner presented his coupons at the State treasury, received in money two-thirds of the interest thereon, and thereupon the second auditor stamped upon each of the coupons the amount so paid in conformity with the provisions of the act of March 19th, 1872.

By the fourth section of that act it is provided that the receipt of such interest should be deemed to be an acquiescence upon the part of the creditor in the provisions of the act of March, 1872. Act of 1871–72, p. 141. This latter act provides that only gold or silver coin, or United States treasury notes, or national bank notes, should thereafter be received in payment of taxes and all other demands of the State.

The proposition made to the coupon holder by the legislature was substantially that the State would pay him two-

thirds of the amount due him, upon condition that he would waive the right to use the remaining third in payment of his taxes. When, therefore, the coupon holder presented his coupon at the treasury, and received payment of the two-thirds in money, he accepted the terms proposed, and thereby entered into a contract with the State, as formal in all its provisions and incidents, and as effectual in its operations, as a citizen can make with the government. In no other way can a State contract except through the instrumentality of law.

The act manifestly applies to such coupons only as are presented at the treasury, paid and stamped by the auditor. Other coupons held by the same creditor, upon which nothing has been demanded and paid, are not embraced by the act. No other construction, so far as I am informed, has ever been contended for by any one. No such question arises in this case; and the only point we have to decide is, whether the creditor having received the two-thirds due him, may still insist upon applying the other third in payment of his dues to the State.

The ground mainly relied upon by the petitioner in support of his petition is, that the partial payment of a debt does not of itself discharge the debtor from the residue, even though the creditor expressly agrees to the discharge —the agreement being without consideration, is a mere *nudum pactum*.

The rule of law thus invoked by petitioner's counsel, although well established, has generally been regarded as in the highest degree technical and unsatisfactory. As it has been well said, the rule itself may obviously be urged in violation of good faith, and is not to be extended beyond its precise import, and whenever the technical reason does not exist, the rule itself is not to be applied. Hence the courts have been disposed to take out of its operation all the cases where there is any new consideration, or any col-

lateral benefit received by the creditor. If, therefore, the consideration of the release be some interest or right vested in the creditor, which he had not before, or if the creditor induce his debtor to pay what the law would not compel him to pay, or sooner than it could be recovered by law, and the debtor pay what he would not otherwise pay, and the creditor could not compel him to pay, this is a sufficient consideration. Smith's Leading Cases, Part 1, Vol. I, 607, 897; 7 Robinson's Practice, 556–7.

Let us apply these principles to the case before us. Notwithstanding some recent *dicta* to the contrary, the doctrine is well established by the highest authority that there is no proceeding or process by which a State can be compelled to pay its debts, however, or for whatever purpose contracted. "It is inherent in the nature of sovereignty," says Mr. Hamilton, "not to be amenable to the suit of an individual. That by adoption of the constitution the States would not be divested of the privilege of paying their own debts in their own way, free from any constraint but that which flows from the obligation of good faith."

Both Mr. Madison and Chief Justice Marshall concurred in this view. See Federalist, Article 81, p. 508.

Mr. Webster, in his letter to Baring Bros. & Co., written in October, 1839, expressed himself still more strongly. He declared the security for State loans is the plighted faith of the State as a political community. It rests on the same basis as other contracts with established governments; the same, for example, as loans made by the United States under the authority of Congress; that is to say, the good faith of the government making the loan, and its ability to pay.

In the case of the *Memphis and Charleston Railroad Company* v. *Tennessee*, reported in 11 Otto U. S. R. 338, the supreme court of the United States said, "The principle is elementary, that a State cannot be sued in its court, without its

consent. This is a privilege of sovereignty, and it may repeal at any time its laws giving such consent, even as to antecedent contracts, without at all infringing the constitutional provision which prohibits a State from passing any law impairing the obligation of the contract. The court further said, when a judgment has been rendered against the State its liability has been judicially ascertained; but there the power of the court ends. The State is at liberty to determine for itself whether to pay the judgment or not; the obligations of the contract have been finally determined, but the claimant still has only the faith and credit of the State to rely on for their fulfillment. The courts are powerless; everything after the judgment depends on the will of the State.

It is needless to say that there is no remedy to enforce a contract if performance is left to the will of him on whom the obligation to perform rests. A remedy is only wanted after entreaty is ended. Consequently that is not a remedy in the legal sense of the term, which can only be carried into effect by entreaty.

These doctrines are perfectly familiar to this court. They are unequivocally expressed in the case of *Higginbotham's Ex'x* v. *The Commonwealth*, 25 Gratt. 641. It was there held that all the courts could do would be to ascertain and render judgment for the debt. Whether it shall be paid or not depended upon the discretion of the legislative department.

It is very true that with reference to certain classes of debts against the State, where the sum is under $300, the court may enforce its judgment by mandatory process to the auditor; but the statutes giving this remedy have no application to the interest upon the public debt. How, and when, and to what extent it may be paid depends upon the condition of the treasury, the incoming revenues, and other circum-

stances to be judged of by a board consisting of the officers in the executive department of the government.

The whole subject of the interest of the public debt is taken from the jurisdiction of the courts. If it be conceded therefore that the creditors of the State may use these coupons in the payment of these taxes and other dues of the government, it will be further conceded this is all they can do. They cannot recover their coupons by suit or other legal process. They cannot compel the State to pay one dollar of them, otherwise than in receipt of her taxes.

When therefore the petitioner, and the same is true of any other coupon holder, received at the treasury in money two-thirds of his interest, he received that which he could not have recovered by law, and that which the State could not be compelled by any tribunal to pay. The payment was of great benefit to the petitioner. Such a payment made under such circumstances, by a party under no legal obligation to pay capable of being enforced, would be universally regarded as sufficient consideration for the release of the third not paid.

But as a matter of fact, the State does not claim the release of any part of the debt secured by the coupon. The transaction was merely an arrangement between the State and the coupon holder, by which the latter, in consideration of receiving two-thirds of his interest in money, waived his right of using the other third in payment of his taxes; the State still continuing bound, however, for the third. This arrangement was beneficial to both parties—the coupon holder in receiving in money what he otherwise could not have received, and the State in collecting a part of her due in money instead of coupons.

The validity of such an arrangement does not, as seems to be supposed, depend upon discussion and negotiation. A proposition made on one side and accepted on the other without a word of discussion constitutes as valid a com-

promise as though months and years were expended in arranging the terms of settlement. This is true, whether applied to governments or to individuals. It is very true this court has decided the act invalidating the receivability of coupons for taxes to be unconstitutional; but I am at a loss to understand in what way this affects the right of the State to make another contract with the holders of such coupons. The effect of these decisions was simply to leave the right to use the coupons in payment of taxes precisely where it was before. That right the holder may waive as he may any other demand upon a fair contract with the State.

The petitioner was under no constraint to accept the payment of the two-thirds in money. It was his privilege to hold on to his coupons, and to apply them to his taxes or to sell them to others for this same purpose. He did not choose to do so. He chose to wave his right, and accept the terms proposed by the State; and in doing so he merely surrendered a right of setoff to the extent of one-third of his demand. But he was prompted to this course, no doubt, by the consideration that he could use part only of the coupons in payment of taxes; that the residue must remain on his hands or be sold at a sacrifice, and that two-thirds received in money, with a right of ultimate recourse for the other third, was a more advantageous arrangement in every respect than the first. When it was the petitioner presented his coupons at the treasury does not appear. Whether before or after the decision of this court the record does not show. If before these decisions were made, it was beyond question the compromise of a doubtful right; if afterwards, the petitioner ought to have averred and proved the fact. Invoking the extraordinary powers of this court in a matter involving a question of public revenue, it was incumbent upon him to bring himself under the rules and limitations which warrant the exercise of that power.

But let it be conceded that the petitioner presented his coupons at the treasury, and received payment after this court had rendered its decisions upon the funding bill of 1871, such concession does not at all affect the result. The transaction was an offer of compromise by the State which was accepted by the petitioner. The rules of law relating to such agreement are well settled and perfectly familiar to the courts.

If one or more parties having, or supposing they have, claims against each other, agree to compromise their claims, and the knowledge, or means of knowledge, of each of them with respect to the mode and the circumstances under which his claim arises, stand upon an equal footing, and there is an absence of fraud or misrepresentation, the transaction is binding, although the conclusion at which the parties may have arrived is not that at which a court of justice would have arrived had its decision been sought; the real consideration which each party receives, under a compromise, being not the sacrifice of the right, but the settlement of the dispute and the abandonment of the claim.

It was said by Lord Macclesfield, in *Cann* v. *Cann*, 1 Peere Wms. 727, where two parties are contending before this court, and one releases his pretensions to the other, there can be no color to set aside this release because the one that made it had a right; for by the same reason there can be no such thing as compromising a suit, nor room for any accommodation. Every release supposes the party making it to have a right; but this can be no reason for its being set aside; for then every release might be avoided. See, also, *Moore* v. *Fitzwater*, 2 Rand. 445. Now let us apply these principles to the case before us.

Notwithstanding the several decisions of this court in the coupon cases, the question of the public debt and of the constitutionality of the funding bill of 1871, continues to

be discussed in the legislature, by the public press, and by the people in their primary assemblages. The best statesmanship of the State finds itself at fault in dealing with the subject. The legislative department of the government charged under the constitution with the duty of laying taxes and of providing the means of discharging the public dues, has throughout manifested unmistakable hostility to the provisions of the funding bill. It repealed the coupon feature of that bill at an early day; and it has, session after session, passed other bills with a view to other and more acceptable adjustments of the public debt. If in this unsettled and complicated condition of public affairs the State and her creditors shall agree upon a settlement involving a release of a part of their demands, in consideration of a prompt payment of the residue, can it be that the creditor, after receiving the payment, may repudiate the settlement and claim the full amount of the original indebtedness?

If this be so, how is any adjustment of the public debt ever to be made, even with the consent of the creditor?' What becomes of the supposed release of the third under the funding bill of 1871, as West Virginia's share of the State's indebtedness? It is impossible that the validity of a compromise between a sovereign State and her creditors can contend upon such narrow and technical grounds as the surrender of an old bond and the execution and exceptance of a new one.

The efficacy of a compromise rests upon the broad ground that it is the settlement of a controversy between the parties, and it is none the less binding because all the right may be on one side, and the conclusion to which the parties come is the very reverse of that which a court of justice would reach if its decision were invoked. It is difficult to perceive any substantial distinction between the agreement under the funding bill of 1874 to surrender one-third

of the debt in consideration of the receiving two-thirds, and an agreement to surrender one-third of the coupons in consideration of receiving two-thirds in money.

It is on this ground, if no other, the right of the State may be sustained.

It has been said, however, that the petitioner had no notice of the act of the 19th of March, 1872; or it does not appear that he had such notice.

This is a mere suggestion of counsel, and is not averred in the petition. It is simply incredible that the petitioner could have proceeded under an act of the legislature to collect in money at the treasury two-thirds of his coupons, and to have them stamped by the auditor, in ignorance of the act under which his right accrued and the proceeding was had. One of the acts referred to the other, and he was necessarily aware of both; and it might, with as much propriety, be insisted that a party is ignorant of the provision of a deed under which he claimed title.

Laws relating to the public revenue are public laws, of which all men are presumed to have notice; especially those who have contracts or dealings with the State, arising out of such laws. It can scarcely be necessary to cite authority in support of a principle so just in itself and so universal in its application.

I have said this much not only because the question is elaborately discussed in the opinion of the majority, but because the case itself involves principles of the 'gravest character. And the decision now made may hereafter be invoked to defeat compromises of the debt, and the settlement of a most perplexing question made with the consent and concurrence of all. It can certainly be no hardship or injustice to leave the petitioner where his own deliberate contract has placed him; and there I am for leaving him.

Moncure, P., and Christian, J., concurred in the opinion of *Anderson, J.*

Burks, J., concurred in the opinion of *Staples, J.*

The order was as follows:

The Commonwealth of Virginia—To M. B. Harlow, treasurer of the city of Alexandria, greeting:

Whereas Cassius F. Lee, Jr., did, on the nineteenth day of February, 1880, tender to you, the said M. B. Harlow, treasurer as aforesaid, fifty-three dollars of interest coupons (estimating them at one-third their face value), payable July 1st, 1872, from bonds issued by the State prior to March 7th, 1872, under the act of the general assembly, approved March 30th, 1871, entitled "An act to provide for the funding and payment of the public debt," which coupons express on their face that they are "receivable at and after maturity for all taxes, debts and demands due the State," said coupons being of those stamped by the second auditor as two-thirds paid and returned to the holders, under the act of March 19th, 1872, entitled "An act to provide for the payment of interest on the public debt," and also thirteen cents in money, the said coupons and money aggregating fifty-three dollars and thirteen cents, in payment of the taxes due the State of Virginia by the said Cassius F. Lee, Jr., for the year 1879, amounting to the said sum of fifty-three dollars and thirteen cents; nevertheless you, the said M. B. Harlow, treasurer as aforesaid (to whom it doth of right belong to collect all State taxes for said city of Alexandria), have refused and still refuse to accept the coupons and money so tendered, in payment of said taxes, due as aforesaid; we, therefore, being willing that due and speedy justice be done to the said Cassius F. Lee, Jr., in this behalf as is reasonable, command you that you receive from the said Cassius F. Lee, Jr., fifty-three dollars

in interest coupons payable July 1st, 1872, under bonds issued by the State prior to March 7th, 1872, under the act of the general assembly of Virginia, approved March 30th, 1871, entitled "An act to provide for the funding and payment of the public debt," which coupons express on their face that they are "receivable at and after maturity for all taxes, debts and demands due the State," said coupons being of those stamped by the second auditor as two-thirds paid and returned to the holders, under the act of March 19th, 1872, entitled "an act to provide for the payment of interest on the public debt" (said coupons being estimated at one-third of their face value), and thirteen cents in lawful money of the United States, in full payment and satisfaction of the taxes due by the said Cassius F. Lee, Jr., to the State of Virginia for the year 1879, amounting to fifty-three dollars and thirteen cents.

And how you shall execute this our command certify to our judges of our supreme court of appeals at our State courthouse, in the city of Richmond, on the first day of the next January term of said court, returning there this our writ. Witness, George K. Taylor, clerk of our said supreme court of appeals, at Richmond, the 26th day of November, 1880, and in the 105th year of the Commonwealth.

GEO. K. TAYLOR.

MANDAMUS ORDERED.